Opinion
Of the Supreme Court of the United States on the Appellate Authority of that Court in respect to State Courts.
Story, J.
This is a writ of error from the Court of Appeals of Virginia, founded upon the refusal of that court to obey the mandate of this court, requiring the judgment rendered in this very cause at February Term 1813, to be carried into due execution.
The following is the judgment of the Court of Appeals rendered on the mandate:—“ The Court is unanimously of opinion that the appellate power of the Supreme Court of the United States does not extend to this court, under a sound construction of the Constitution of the United States. That so much of the 25th section of the Act of Congress to establish the Judicial Courts of the United States, as extends the appellate jurisdiction of the Supreme Court to this court, is not in pursuance of the Constitution of the United States. That the writ of error in this cause was improvidently allowed under the authority of that act. *496 That the proceedings thereon in the Supreme Court were coram non judice in relation to this court. And that obedience to its mandate be declined by the Court.”
The questions involved in this judgment are of great importance and delicacy. Perhaps it is not too much to affirm that upon their right decision rest some of the most solid principles which have hitherto been supposed to sustain and protect the Constitution itself. The great respectability of the court whose decisions we are called upon to review, and the entire deference which we entertain, for the learning and ability of that court, add much to the difficulty of the task which has so unwelcomely fallen upon us. It is however a source of consolation that we have had the assistance of most able and learned arguments to aid our inquiries; and that the opinion which is now to be pronounced, has been weighed with every solicitude to come to a correct result, and matured after solemn deliberation.
Before proceeding to the principal questions, it may not be unfit to dispose of some preliminary considerations which have grown out of the arguments at the bar.
The Constitution of the United States was ordained and established, not by the States in their sovereign capacities, but, emphatically, as the preamble to the Constitution declares, by “The people of the United States.” There can be no doubt that it was competent to the people to invest the general government with all the powers, which they, might deem proper and necessary; to extend or restrain these powers according to their own good pleasure; and to give them a paramount and supreme authority. As little doubt can there be that the people had a right to prohibit to the States the exercise of any powers which were in their judgment incompatible with the objects of the general compact; to make the powers of the state governments in given cases subordinate to those of the nation, or to reserve to *497 themselves those sovereign authorities which they might not choose to delegate to either. The Constitution was not therefore necessarily carved out of existing state sovereignties; nor a surrender of powers already existing in state institutions; for the powers of the States depended, upon their own Constitutions, and the people of every State had the right to modify and restrain them according to their own views of policy or of principle. On the other hand, it is perfectly clear that the sovereign powers vested in the state governments by their respective constitutions remained unaltered and unimpaired, except so far as they were granted to the government of the United States.
These deductions do not rest upon general reasoning, plain and obvious as they seem to be. They have been positively recognized by one of the articles in amendment of the Constitution, which declares that “the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively or to the people."
The government of the United States can claim no powers which are not granted to it by the Constitution; and the powers actually granted, must be such as are expressly given, or given by necessary implication. On the other hand, this instrument, like every other grant, is to have a reasonable construction according to the import of its terms. And where a power is expressly given in general terms, it is not to be restrained to particular cases, unless that construction grows out of the context expressly or by necessary implication. The words are to be taken in their natural and obvious sense, and not in a sense unreasonably restricted or enlarged.
The Constitution unavoidably deals general language. It did not suit the purposes of the people in framing this great charter of our liberties to provide for minute specifi *498 cations of its powers, or to declare the means by which those powers should be carried into execution. It was foreseen that this would be a perilous and difficult, if not an impracticable task. The instrument was not intended to provide merely for the exigencies of a few years, but was to endure through a long lapse of ages, the events of which were locked up in the inscrutable purposes of Providence. It could not be foreseen what new changes and modifications of power might be indispensable to effectuate the general objects of the charter; and restrictions and specifications, which at the present might seem salutary, might in the end prove the overthrow of the system itself. Hence its powers are expressed in general terms, leaving to the Legislature from time to time to adopt its own means to effectuate legitimate objects, and to mould and model the exercise of its powers as its own wisdom and the public interest should require.
With these principles in view, principles in respect to which no difference of opinion ought to be indulged, let us now proceed to the interpretation of the Constitution, so far as regards the great points in controversy.
The 3d article of the Constitution is that which must principally attract our attention. The 1st section declares, “ the judicial power of the United States shall be vested in one Supreme Court, and in such other inferior courts as the Congress may from time to time ordain and establish.” The 3d section declares that “the judicial power shall extend to all cases in law or equity arising under this Constitution, the laws of the United States, and the treaties made or which shall be made under their authority; to all cases affecting ambassadors, other public ministers, and consuls; all cases of admiralty and maritime jurisdiction; to controversies to which the United States shall be a party; to controversies between two or more States; between a State *499 and citizens of another state; between citizens of different states; between citizens of the same state claiming lands under the grants of different states; and between a state or the citizens thereof, and a foreign state, citizens of subjects.” It then proceeds to declare that “ in all cases affecting ambassadors, other public ministers, and consuls, and those in which a state shall be a party, the Supreme Court shall have original jurisdiction. In all other cases before mentioned, the Supreme Court shall have appellate jurisdiction both as to law and fact, with such exceptions, and under such regulations as the Congress shall make.”
Such is the language of the article creating and defining the judicial power of the United States. It is the voice of the whole American people solemnly declared, in establishing one great department of that government which was in many respects national, and in all supreme. It is a part of the very same instrument which was not to operate merely upon individuals but upon states. And to deprive them altogether of the exercise of some powers of sovereignty, and to restrain and regulate them in the exercise of others.
Let this article be carefully weighed and considered. The language of the article throughout is manifestly designed to be mandatory upon the Legislature. Its obligatory force is so imperative, that Congress could not without a violation of its duty, have refused to carry it into operation. The judicial power of the United States shall be vested (not may be vested), in one Supreme Court and in such inferior courts as Congress may from time to time ordain and establish. Could Congress have lawfully refused to create a supreme court or to vest in it the constitutional jurisdiction? “ The judges, both of the supreme and inferior courts shall hold their offices during good behaviour, and shall, at stated times, receive for their services a compensation which shall not be diminished during their continuance office." Could Congress create *500 or limit any other tenure of the judicial office? Could they refuse to pay at stated times the stipulated salary, or diminish it during the continuance in office? But one answer can be given to these questions. It must be in the negative. The object of the Constitution was to establish three great departments of government,—the legislative, the executive, and the judicial departments. The first was to pass laws, the second to approve and execute them, and the third to expound and enforce them. Without the latter it would be impossible to carry into effect some of the express provisions of the Constitution. How otherwise could crimes against the United States be tried and punished? How could causes between two states be heard and determined? The judicial power must therefore be vested in some court by Congress. And to suppose that it was not an obligation binding on them, but might at their pleasure be omitted or declined, is to suppose that under the sanction of the Constitution they might defeat the Constitution itself. A construction that would lead to such a result cannot be sound*.
If then it is the duty of Congress to vest the judicial power of the United States, it is a duty to vest the whole judicial power. The language, if imperative as to one part, is imperative as to all. If it were otherwise, this anomaly would exist,—that Congress might successively refuse to vest the jurisdiction in any one class, of cases enumerated in the Constitution, and thereby defeat the jurisdiction as to *501 all. For the Constitution has not singled out any class on which Congress are bound to act in preference to others.
The next consideration is as to the courts which the judicial power shall be vested. It is manifest that a supreme court must be established. But whether it be equally obligatory to establish inferior courts, is a question of some difficulty. If Congress may lawfully omit to establish inferior courts, it might follow, that in some of the enumerated, cases, the judicial power could no where exist. The Supreme Court can have original jurisdiction, in two classes of cases only, viz. in cases affecting ambassadors, other public ministers, and consuls, and in cases in which a state is a party. Congress cannot vest any portion of the judicial power of the United States, except in courts ordained and established by itself. And if in any of the cases enumerated in the Constitution the state courts did not then possess jurisdiction, the appellate jurisdiction of the Supreme Court (admitting that it could not act on state courts), could not reach those cases; and consquently the injunction of the Constitution, that the judicial power “ shall be vested," would be disobeyed. It should seem therefore to follow, that Congress are bound to create some inferior courts, in which to vest all that jurisdiction which, under the Constitution, is exclusively vested in the United States, and of which the Supreme Court cannot take original cognizance.
They might establish one or more inferior courts. They might parcel out the jurisdiction among such courts from time to time at their own pleasure. But the whole judicial power of the United States should be at all times vested either in an original or appellate form in some courts created under its authority.
This construction will be fortified by an attentive examination of the 2d section of the 3d article. The words are “the judicial power shall extend” &c. Much minute *502 and elaborate criticism has been employed upon these words. It has been argued that they are equivalent to the words ‘may extend’ and that ‘extend’ means to widen to new cases not before within the scope of the power. For the reasons which have been already stated, we are of opinion, the words are used in an imperative sense. They import an absolute grant of judicial power. They cannot have a relative signification applicable to powers already granted, for the American people had not made any previous grant. The Constitution was for a new government organized with new substantive powers, and not a mere supplementary charter to a government already existing. The confederation was a compact between states; and its structure and powers, were wholly unlike those of the national government. The Constitution was an act of the people of the United States to supersede the confederation, and not to be engrafted on it, as a stock through which it was to receive life and nourishment.
If indeed the relative signification could be fixed upon the term ‘extent,’ it could not (as we shall hereafter see) subserve the purposes of the argument, in support of which it has been adduced. This imperative sense of the words “shall extend,” is strengthened by the context. It is declared that “in all cases affecting ambassadors, &c. that the Supreme Court shall have original jurisdiction.” Could Congress withhold original jurisdiction in these cases from the Supreme Court? The clause proceeds—“in all other the cases before mentioned, the Supreme Court shall have appellate jurisdiction, both as to law and fact, with such exceptions and under such regulations as the Congress shall make.” The very exception here shows that the framers of the Constitution used the words in an imperative sense. What necessity could there exist for this exception, if the preceding words were not used in that sense? Without such exception, Congress would, by the preceding words, *503 have possessed a complete power, to regulate, the appellate jurisdiction, if the language were only equivalent to the words “may have” appellate jurisdiction. It is apparent then that the exception was intended as a limitation upon the preceding words, to enable Congress to regulate and restrain the appellate power, as the public interests might front time to time require.
Other clauses in the Constitution might be brought in aid of this construction. But a minute examination of them cannot be necessary, and would occupy too much time. It will be found, that whenever a particular object is to be effected, the language of the Constitution is always imperative; and cannot be disregarded without violating the first principles of public duty. On the other hand, the legislative powers are given in language which implies discretion as from the nature of legislative power such a discretion must ever be exercised.
It being then established that the language of this clause is imperative, the next question is as to the cases to which it shall apply. The answer is found in the Constitution itself. The judicial powers shall extend to all the cases enumerated in the Constitution. As the mode is not limited, it may extend to all such cases in any form in which judicial power may be exercised. It may therefore extend to them in the shape of original of appellate jurisdiction, or both. For there is nothing, in the nature of the cases which binds to the exercise of the one in preference to the other.
In what cases, if any, is this judicial power exclusive, or exclusive at the election of Congress? It will be observed that there are two classes of cases enumerated in the Constitution, between which a distinction seems to be drawn. The first class includes cases arising under the Constitution, laws, and treaties of the United States; cases affecting ambassadors other public ministers, and consuls; and *504 cases of admiralty and maritime jurisdiction. In this class the expression is, and that the judicial power shall extend to all cases; but in the subsequent part of the clause which embraces all the other cases of national cognizance, and forms the second class, the word "all” is dropped seemingly ex industria. Here the judicial authority is to extend to controversies, (not to all controversies) to which the United States shall be a party, &c. From this difference of phraseology perhaps a difference of constitutional intention may with propriety be inferred. It is hardly to be presumed that the variation in the language could have been accidental. It must have been the result of some determinate reason; and it is not very difficult to find a reason sufficient to support the apparent change of intention. In respect to the first class, it may well have been the intention of the framers of the Constitution imperatively to extend the judicial power either in an original or appellate form to all cases: and in the latter class to leave it to Congress to qualify the jurisdiction original or appellate in such a manner as public policy might dictate.
The vital importance of all the cases enumerated in the first class to the national sovereignty, might warrant such a distinction. In the first place, as to cases arising under the Constitution laws, and treaties of the United States. Here the State courts could not ordinarily possess a direct jurisdiction. The jurisdiction over such cases could not exist in the state courts previous to the adoption of the Constitution, and it could not afterwards be directly conferred on them. For the Constitution expressly requires the judicial power to be vested in courts ordained and established by the United States. This class of cases would embrace civil as well as criminal jurisdiction, and affect not only our internal policy, but our foreign relations. It would therefore be perilous to restrain it in any manner whatsoever, inasmuch as it might hazard the national safety. The *505 same remarks may be urged as to cases affecting ambassadors, other public ministers, and consuls, who are emphatically placed under the guardianship of the law of nations. And as to cases of admiralty and maritime jurisdiction, the admiralty jurisdiction embraces all questions of prize and salvage; in the correct adjudication of which foreign nations are deeply interested. It embraces also maritime facts, contracts and offences; in which the principles of the law and comity of nations often form an essential inquiry. All these cases then enter into the national policy, affect the national rights, and may compromit the national sovereignty. The original or appellate jurisdiction ought not therefore to be restrained, but should be commensurate with the mischiefs intended to be remedied, and of course should extend to all cases whatsoever.
A different policy might well be adopted in reference to the second class of cases. For although it might be fit that the judicial power should extend to all controversies to which the United States should be a party; yet this power might not have been imperatively given, lest it should imply a right to take cognizance of original suits brought against the United States as defendants in their own courts. It ought not have been deemed proper to submit the sovereignty of the United States against their own will, to judicial cognizance, either to enforce rights or prevent wrongs. And as to the other cases of the second class, they might well be left to be exercised under the exceptions and regulations which Congress might in their wisdom choose to apply. It is also worthy of remark that Congress seem in a good degree, in the establishment of the present judicial system, to have adopted this distinction. In the first class of cases the jurisdiction is not limited by the subject matter. In the second, it is made materially to depend upon the value in controversy. We do not however profess to place any implicit reliance upon the distinction which has *506 hence been stated and endeavoured to be illustrated. It has the rather been brought into view in deference to the legislative opinion, which has been so long acted upon and enforced this distinction. But there is certainly vast weight in the argument which has been urged, that the Constitution is imperative upon Congress to vest all the judicial power of the United States, in the shape of original jurisdiction, in the supreme and inferior courts created under its own authority. At all events, whether the one construction or the other prevail, it is manifest that the judicial power of the United States is unavoidably in some cases exclusive of all state authority, and in all others may be made so at the election of Congress. No part of the criminal jurisdiction of the United States can consistently with the Constitution be delegated to state tribunals. The admiralty and maritime jurisdiction is of the same exclusive cognizance; and it can only be in those cases, where, previous to the Constitution, state tribunals possessed jurisdiction independent of national authority, that they can now constitutionally exercise a constituent jurisdiction. Congress throughout the judicial act, and particularly in the 9th, 11th, and 12th sections, have legislated upon the supposition that in all the cases to which the judicial powers of the United States extended, they might rightfully vest exclusive jurisdiction in their own courts*.
This leads us to the consideration of the great question as to the nature and extent of the appellate jurisdiction of the United States. We have already seen that appellate jurisdiction is given by the Constitution to the Supreme Court in all cases where it has not original jurisdiction, subject *507 however to such exceptions and regulations as Congress may prescribe. It is therefore capable of embracing every case enumerated in the Constitution which is not exclusively to be decided by way of original jurisdiction. But the exercise of appellate jurisdiction is far from being limited by the terms of the Constitution to the Supreme Court. There can be no doubt that Congress may create a succession of inferior tribunals, in each of which it may vest appellate as well as original jurisdiction. The judicial power is delegated by the Constitution in the most general terms, and may therefore be exercised by Congress under every variety of form, of appellate or original jurisdiction. And as there is nothing in the Constitution which restrains, or limits this power, it must therefore in all other cases subsist in the utmost latitude, of which in its own nature, it is susceptible.
As then by the terms of the Constitution the appellate jurisdiction is not limited as to the Supreme Court, and as to this court it may be exercised in all other cases that those of which it has original cognizance, what is there to restrain its exercise, over state tribunals in the enumerated cases? The appellate power is not limited by the terms of the 3d article to any particular courts. The words are "the judicial power, (which includes appellate power) shall extend to all cases,” &c. and "in all other cases before mentioned, the Supreme Court shall have appellate jurisdiction.” It is the case then, and not the Court that gives the jurisdiction. If the judicial power extends to the case it will be in vain to search into the letter of the Constitution for any qualification as to the tribunal where it depends. It is incumbent then upon those who assert such a qualification to show its existence by necessary implication. If the text be clear and distinct, no restriction upon its plain and obvious import ought to be admitted, unless the inference be irresistible.
*508 If the Constitution meant to limit the appellate jurisdiction to cases pending in the courts of the United States, it would necessarily follow that the jurisdiction of these courts would, in all the cases enumerated in the Constitution, be exclusive of state tribunals. How otherwise could the jurisdiction extend to all cases arising under the Constitution, laws, and treaties of the United States, or to all cases of admiralty and maritime jurisdiction? If some of these cases might be entertained by state tribunals and no appellate jurisdiction as to them should exist, then the appellate power would not extend to all, but to some cases. If state tribunals might exercise concurrent jurisdiction over all or some of the other classes of cases in the Constitution without, control, then the appellate jurisdiction of the United States might, as to such cases, have no existence, contrary to the manifest intent of the Constitution. Under such circumstances, to give effect to the judicial power, it must be construed to be exclusive. And this not only when the casus fœderis should arise directly, but when it should arise incidentally in cases pending in state courts. This construction would abridge the jurisdiction of such courts far more than has been ever contemplated in any act of Congress.
On the other hand, if, as has been contended for, a discretion be vested in Congress to establish or not to establish inferior courts at their own pleasure, and Congress should not establish such courts, the appellate jurisdiction of the Supreme Court would have nothing to act upon, unless it could act upon cases pending in the state courts. Under such circumstances it must be held that the appellate power would extend to state courts; for the Constitution is peremptory that it shall extend to certain enumerated cases, which cases could exist in no other courts. Any other construction upon this supposition, would involve, this strange contradiction, that a discretionary power vested in Congress, *509 and which they might rightfully omit to exercise, would defeat the absolute injunctions of the Constitution in relation to the whole appellate power.
But it is plain that the framers of the Constitution did contemplate that cases within the judicial cognizance of the United States, not only might but would arise in the state courts in the exercise of their ordinary jurisdiction. With this view the 6th article declares, that “this Constitution and the laws of the United States which shall be made in pursuance thereof, and all treaties, made or which shall be made under the authority of the United States, shall be the supreme law of the land, and the judges in every state shall be bound thereby; any thing in the Constitution or laws of any state to the contrary notwithstanding.” It is obvious that this obligation is imperative upon the state judges in their official, and not merely in their private capacities. From the very nature of their judicial duties, they would be called upon to pronounce the law applicable to the case in judgment. They were not to decide merely according to the laws or Constitution of the State, but according to the Constitution, laws and treaties of the United States—“the supreme law of the land.”
A moment’s consideration will show us the necessity and propriety of this provision in cases where the jurisdiction of the state courts is unquestionable. Suppose a contract for the payment of money is made between, citizens of the same state, and performance thereof is sought in the courts of that state. No person can doubt that the jurisdiction completely and exclusively attaches in the first instance to such courts. Suppose at the trial, the defendant sets up in his defence a tender under a state law making paper a good tender, or a state law impairing the obligation of such contracts, which, if binding, would defeat the suit. The Constitution of the United States has declared that no state shall make any thing but gold or silver coin a tender *510 in payment of debts, or pass a law impairing the obligation of contracts. If Congress shall not have here passed a law providing for the removal of such a suit to the courts of the United States, must not the state court proceed to hear and determine it? Can a mere plea in defence be of itself a bar to further proceedings, so as to prohibit an inquiry into its truth of legal propriety, when no other tribunal exists to whom judicial cognizance of such cases is confided? Suppose an indictment for a crime in a state court, and the defendant should allege in his defence that the crime was created by an ex post facto act of the State, must not the state court in the exercise of a jurisdiction which has already rightfully attached, have a right to pronounce on the validity and sufficiency of the defence? It would be extremely difficult upon any legal principles to give a negative answer to these inquiries. Innumerable instances of the same sort might be stated in illustration of the position; and unless the state courts could sustain jurisdiction in such cases, this clause of the 6th article would be without meaning or effect, and public mischiefs of a most enormous magnitude would inevitably ensue.
It must therefore be conceded, that the Constitution not only contemplated, but meant to provide for cases within the scope of the judicial power of the United States, which might yet depend before state tribunals. It was foreseen, that in the exercise of them ordinary jurisdiction, state courts would incidentally take cognizance of cases arising under the Constitution, the laws, and treaties of the United States. Yet to all these cases the judicial power, by the very terms of the Constitution, is to extend. It cannot extend by original jurisdiction, if that was already rightfully and exclusively attached in the state courts, which (as has been already shown) may occur. It must therefore extend by appellate jurisdiction, or not at all. It would seem to follow, that the appellate power of the United States must *511 in such case’s extend to state tribunals; and if in such cases, there is no reason why it should not equally attach upon all others within the purview of the Constitution.
It has been argued that such an appellate jurisdiction over state courts is inconsistent with the genius of our governments, and the spirit of the Constitution. That the latter was never designed to act upon state sovereignties, but only upon the people; and that if the power exists, it will materially impair the sovereignty of the states and the independence of their courts. We cannot yield to the force of this reasoning. It assumes principles which we cannot admit, and draws conclusions to which we do not yield our assent.
It is a mistake that the Constitution was not designed to operate upon states in their corporate capacities. It is crowded with provisions which restrain or annul the sovereignty of the states in some of the highest branches of their sovereignties. The 10th section of the 1st article contains a long list of disabilities and prohibitions imposed upon the states. Surely, when such essential portions of state sovereignty are taken away or prohibited to be exercised, it cannot be correctly asserted that the Constitution does not act upon the states. The language of the Constitution is also imperative upon the states as to the performance of many duties. It is imperative upon the State Legislatures to make laws prescribing the time, place, and manner of holding elections for senators and representatives, and for electors of President and Vice-President. And in these as well as some other cases, Congress have a right to revise, amend, or supersede the laws which may be passed by State Legislatures. When therefore the states are stripped of some of the highest attributes of sovereignty and the same are given to the United States; when the Legislatures of the states are in some respects under the control of Congress, and in every case are, under the Constitution, bound by the param *512 ount authority of the United States,—it is certainly difficult to support the argument that the appellate power over the decision of state courts is contrary to the genius of our institutions. The courts of the United States can without question revise the proceedings of the executive and legislative authorities of the states, and if they are found to be contrary to the Constitution, may declare them to be of no legal validity. Surely, the exercise of the same right over judicial tribunals is not a higher or more dangerous act of sovereign power. Nor can such a right be deemed to impair the independence of state judges. It is assuming the very ground in controversy to assert that they possess an absolute independence of the United States.
In respect to the powers granted to the United States they are not independent. They are expressly bound to obedience by the letter of the Constitution; and if they should unintentionally transcend their authority, or misconstrue the Constitution, there is no more reason for giving their judgments an absolute and irresistible force, than for giving it to the acts of the other subordinate departments of state sovereignty. The argument urged from the possibility of the abuse of the revising power is equally unsatisfactory. It is always a doubtful course to argue against the use or existence of a power from the possibility of its abuse. It is still more difficult by such an argument to engraft upon a general power a restriction, which is not to be found in the terms in which it is given. From the very nature of things the absolute right of decision in the last resort must rest somewhere. Wherever it maybe vested, it is susceptible of abuse. In all questions of jurisdiction, the inferior or the appellate court, must pronounce the final judgment; and common sense as well as legal reasoning has conferred it upon the latter.
It has been farther argued against the existence of this appellate power that it would form a novelty in our judicial *513 institutions. This is certainly a mistake. In the articles of confederation, an instrument framed with infinitely more deference to state rights and state jealousies, a power was given to Congress, to establish “courts for revising and determining finally appeals in all cases of captures." It is remarkable that no power was given to entertain original jurisdiction in such cases; and consequently the appellate power (although not so expressed in terms) was altogether to be exercised in revising the decisions of state tribunals. This was undoubtedly so far a surrender of state authority. But it never was supposed to be a power fraught with public danger, or destructive of the independence of state judges. On the contrary, it was supposed to be a power indispensible to the public safety, inasmuch as our national rights might otherwise be compromited and our national peace be endangered. Under the present Constitution the prize jurisdiction is confined to the United States; and a power to revise the decisions of state courts, if they should assert jurisdiction over prize causes, cannot be less important or less useful than it was under the confederation.
In this connexion we are led again to the Construction of the words of the Constitution, “the judicial power shall extend,” &c. If, as has been contended at the bar, the term "extend" have a relative signification and mean to widen an existing power, it will then follow that as the confederation gave an appellate power over state tribunals, the Constitution enlarged or widened that appellate power to all the other cases in which jurisdiction is given to the courts of the United States. It is not presumed that the learned counsel should choose, to adopt such a conclusion.
It is further argued that no great public mischief can result from a construction which shall limit the appellate power of the United States to cases of their own courts; first, because state judges are bound by an oath to support the Constitution of the United States, and must be presumed *514 to be men of learning and integrity; and secondly, because Congress must have an unquestionable right to remove all cases within the scope of the judicial power from the state courts to the courts of the United States at any time before final judgment, though not after final judgment. As to the first reason,—admitting that the judges of the state courts are and always will be of as much learning, integrity, and wisdom as those of the courts of the United States, (which we very cheerfully admit) it does not aid the argument. It is manifest that the Constitution has proceeded upon a theory of its own, and given or withheld powers according to the judgment of the American people, by whom it was adopted. We can only construe its powers and cannot enquire into the policy or principles which induced the grant of them. The Constitution has presumed (whether rightly or wrongly we do not enquire) that state attachments, state prejudices, state jealousies, and state interests might sometimes obstruct or control, or be supposed to obstruct or control the regular administration of justice. Hence in controversies between states; between citizens of different states; between citizens claiming grants under different states; between a state and its citizens or foreigners, and between citizens and foreigners, it enables the parties under the authority of Congress to have controversies heard, tried, and determined before the national tribunals. No other reason than that which has been stated, can be assigned why some at least of those cases should not have been left to the cognizance of the state courts. In respect to the other enumerated cases, the cases arising under the Constitution, laws, and treaties of the United States, cases affecting ambassadors and other public ministers, and cases of admiralty and maritime jurisdiction; reasons of a higher and more extensive nature touching the safety, peace, and sovereignty of the nation, might well justisfy a grant of executive jurisdiction.
*515 This is not all. A motive of another kind, perfectly compatible with the most sincere respect for state tribunals, might induce the grant of appellate power over their decisions. That motive is the importance and even necessity of uniformity of decisions throughout the whole United States, upon all subjects within the purview of the Constitution. Judges of equal learning and integrity in different states, might differently interpret a statute or a treaty of the United States, or even the Constitution itself. If there were no revising authority to control these jarring and discordant judgments and harmonize them into uniformity, the laws, the treaties, and the Constitution of the United States would be different in different states; and might perhaps never have precisely the same construction, obligation, or efficacy, in any two states. The public mischief that would attend such a state of things would be truly deplorable; and it cannot be believed that they should have escaped the enlightened convention which formed the Constitution. What indeed might then have been prophecy, has now become fact; and the appellate jurisdiction must continue to be the only adequate remedy for such evils.
There is an additional consideration which is entitled to great weight. The Constitution of the United States was designed for the common and equal benefit of all the people of the United States. The judicial power was granted for the same benign and salutary purpose. It was not to be exclusively for the benefit of parties who might be plaintiffs and would elect the national forum; but also for the protection of defendants who might be, entitled to try their rights or assert their privileges before the same forum. Yet if the construction contended for be correct, it will follow that as the plaintiff may always elect the state court, the defendant may be deprived of all the security which the Constitution intended in aid of his rights. Such a state of things can in no respect be considered as giving equal rights. *516 To obviate this difficulty, we are referred to the power which it is admitted Congress posses, to remove suits from state courts to the national courts; and this forms the second ground upon which the argument we are considering has been attempted to be sustained.
This power of removal is not to be found in express terms in any part of the Constitution. If it be given, it is only given by implication as a power necessary and proper to carry into effect some express power. The power of removal is certainly not, in strictness of language, an exercise of original jurisdiction. It presupposes an original jurisdiction to have attached elsewhere. The existence of this power of removal is familiar in courts acting according to the course of the common law in criminal as well as civil cases, and it is exercised before as well as after judgment. But this is always deemed in both cases, an exercise of appellate and not of original jurisdiction. If then the right of removal be included in the appellate jurisdiction it is only because it is one mode of exercising that power. And as Congress is not limited by the Constitution to any particular mode, or time of exercising it, it may authorise a removal either before or after judgment. The time, the process, and the manner must be subject to its absolute legislative control. A writ of error is indeed but a process which removes the record of one court to the possession of another court, and env abies the latter to inspect the proceedings and give such judgment as its own opinion of the law and justice of the case may warrant. There is nothing in the nature of the process which forbids it from being applied by the legislature to interlocutory as well as final judgments. And if the right of removal from state courts exist before judgment, because it is included in the appellate power; it must for the same reason exist after judgment. And if the appellate power by the Constitution does not include cases pending in state courts, the right of removal, which is but a mode of exercising that power, can *517 not be applied to them. Precisely the same objections therefore exist as to the right of removal before judgment as after, and both must stand or fall together. Nor indeed would the force of the arguments on either side, materially vary, if the right of removal were the exercise of original jurisdiction. It would equally trench upon the jurisdiction and independence of state tribunals*.
On the whole, the Court are of opinion that the appellate power of the United States does extend to cases pending in the state courts; and that the 25th section of the judiciary act, which authorises the exercise of this jurisdiction in the specified cases by a writ of error, is supported by the letter and spirit of the Constitution. We find no clause in that instrument which limits this power, and we dare not interpose a limitation where the people have not been disposed to grant one.
Strong as this conclusion stands upon the general language of the Constitution, it may still derive support from other sources. It is a historical fact, that this exposition of the Constitution, extending its appellate power to state courts, was, previous to its adoption, uniformly and publicly avowed by its friends and admitted by its enemies as the *518 basis of their respective reasonings both in and out of the State conventions. It is a historical fact, that at the time when the judiciary act was submitted to the deliberations of the first Congress, composed as it was not only of men of great learning and ability, but of men who had acted a principal part in framing, supporting, or opposing that Constitution, the same exposition was explicitly declared and admitted by the friends and by the opponents of that system. It is a historical fact, that the Supreme Court of the United States have from time to time sustained this appellate jurisdiction in a great variety of cases brought from the tribunals of many of the most important states in the union,—and that no state tribunal has ever breathed a judicial doubt on the subject, or declined to obey the mandate of the Supreme Court until the present occasion. This weight of contemporaneous exposition by all parties, this acquiescence of enlightened state courts, and these judicial decisions of the Supreme Court through so long a period, do, as we think, place the doctrine upon a foundation of authority which cannot be shaken without delivering over the subject to perpetual and irremediable doubts.
The next question which has been argued is, whether the case at bar be within the purview of the 25th section of the judiciary act, so that this court may rightfully sustain the present writ of error. This section, stripped of passages unimportant in this inquiry, enacts in substance that a final judgment or decree in any suit in the highest court of law or equity of a state, where is drawn in question the validity of a treaty or statute of, or an authority exercised under the United States, and the decision is against their validity, or where is drawn in question the validity of a statute of, or an authority exercised under any state, on the ground of their being repugnant to the Constitution, treaties, or laws of the United States, and the decision is in favour of such, their validity; or the Constitution, or of a treaty or statute *519 of, or commission held under the United States, and the decision is against the title, right, privilege, or exemption, specially set up or claimed by either party under such, clause of the said Constitution, treaty, statute, or commission, may be re-examined and reversed of affirmed in the Supreme Court of the United States upon a writ of error, in the same manner and under the same regulations, and the writ shall have the same effect, as if the judgment or decree complained of had been rendered of passed in a circuit court, and the proceeding upon the reversal shall also be the same, except that the Supreme Court, instead of remanding the cause for a final decision as before provided, may at their discretion, if the cause shall have been once remanded before, proceed to a final decision of the same, and award execution. But no other error shall be assigned or regarded as a ground of reversal in any such case as aforesaid, than such as appears upon the face of the record and immediately respects the before mentioned question of validity or construction of the said Constitution, treaties, statutes, commissions, or authorities in dispute.
That the present writ of error is founded upon a judgment of the court below, which drew in question and denied the validity of a statute of the United States is incontrovertible, for it is apparent upon the face of the record. That this judgment is final upon the rights of the parties, is equally true; for if well founded, the former judgment of that court was of conclusive authority, and the former judgment of this court utterly void. The decision was therefore equivalent to a perpetual stay of proceedings upon the mandate, and a perpetual denial of all the rights acquired under it. The case then falls directly within the terms of the act. It is a final judgment in a suit in a state court, denying the validity of a statute of the United States; and unless a distinction can be made between proceedings under a mandate and proceedings in an original suit, a writ of er *520 ror is the proper remedy to revise that judgment. In our opinion, no legal distinction exists between the cases.
In causes remanded to the Circuit Courts, if the mandate is not correctly executed, a writ of error or appeal has always been supposed to be a proper remedy, and has been recognized as such in the former decisions of this court. The statute gives the same effect to the writs of error from the judgments of state courts as of the circuit courts; and in its terms provides for proceedings where the same cause may be a second time brought up on writ of error before the Supreme Court. Here is no limitation or description of the cases to which the second writ of error may be applied; and it ought therefore to be co-extensive with the cases which fall within the mischiefs of the statute. It will hardly be denied that this cause stands in that predicament; and if so, then the appellate jurisdiction of this court has rightfully attached.
But it is contended that the former judgment of this court was rendered upon a case not within the purview of this section of the judicial act, and that as it was pronounced by an incompetent jurisdiction, it was utterly void, and cannot be a sufficient foundation to sustain any subsequent proceedings. To this argument several answers may be given. In the first place, it is not admitted that upon this writ of error the former record is before us. The error now assigned is not in the former proceedings, but in the judgment rendered upon the mandate issued after the former judgment. The question now litigated is not upon the construction of a treaty, but upon the constitutionality of a statute of the United States, which clearly is within our jurisdiction. In the next place, in ordinary cases, a second writ of error has never been supposed to draw in question the propriety of the first judgment, and it is difficult to perceive how such a proceeding could be sustained upon principle. A final judgment of this court is supposed to be *521 conclusive upon the rights which it decides, and no statute has provided any process by which this court can revise its own judgments. In several cases which have been formerly adjudged in this court the same point was argued by counsel and expressly overruled. It was solemnly held that a final judgment of this court was conclusive upon the parties and could not be re-examined.
In this case however, from motives of a public nature, we are entirely willing to waive all objections and to go back and re-examine the question of jurisdiction as it stood upon the record formerly in judgment. We have great confidence that our jurisdiction will, on a careful examination, stand confirmed as well upon principle as authority. It will be recollected that the action was an ejectment for a parcel of land in the Northern Neck, formerly belonging to Lord Fairfax. The original plaintiff claimed the land under a patent granted to him by the state of Virginia, in 1789, under a title supposed to be vested in that state by escheat or forfeiture. The original defendant claimed the land as devisee under the will of Lord Fairfax. The parties agreed to a special statement of facts in the nature of a special verdict, upon which the District Court of Winchester in 1798 gave a general judgment for the defendant; which judgment was afterwards reversed in 1810 by the Court of Appeals, and a general judgment was rendered for the plaintiff; and from this last judgment a writ of error was brought to the Supreme Court. The statement of facts contained a regular deduction of the title of Lord Fairfax until his death in 1781, and also the title of his devisee. It also contained a regular deduction of the title of the plaintiff under the State of Virginia, and further referred to the treaty of peace of 1783, and to the acts of Virginia respecting the lands of Lord Fairfax and the supposed escheat or forfeiture thereof as component parts of the case. No facts disconnected with the titles thus set up by the parties were alleged on *522 either side. It is apparent from this summary explanation that the title thus set up by the plaintiff might be open to other objections but the title of the defendant was perfect and complete, if it was protected by the treaty of 1783. If therefore this court had authority to examine into the whole record and to decide upon the legal validity of the title of the defendant as well as the application of the treaty of peace, it would be a case within the express purview of the 25th section of the act. For there was nothing in the record upon which the court below could have decided but upon the title as connected with the treaty. And if the title was otherwise good, its sufficiency must have depended altogether upon its protection under the treaty. Under such circumstances it was strictly a suit where was drawn in question the construction of a treaty, and the decision was against the title specially set up or claimed by the defendant. It would fall then within the very terms of the acts.
The objection urged at the bar is, that this court cannot enquire into the title, but simply into the correctness of the construction put upon the treaty by the Court of Appeals; and that their judgment is not re-examinable here, unless it appear on the face of the record that some construction was put upon the treaty. If therefore that court might have decided the case upon the invalidity of the title (and non constat that they did not) independent of the treaty, there is an end to the jurisdiction of this court. In support of this objection much stress is laid upon the last clause of the section which declares that no other cause shall be regarded as a ground of reversal than such as appears on the face of the record and immediately respects and construction of the treaty, &c. in dispute.
If this be the true construction of the section, it will be wholly inadequate to the purposes which it professes to have in view, and be evaded at pleasure. But we see no reason for adopting this narrow construction. And there are the *523 strongest reasons, against it founded upon the words as well as the intent of the Legislature. What is the case for which the body of the section provides a remedy by writ of error? The answer must be, in the words of the section, a suit where is drawn in question the construction of a treaty and the decision is against the title set up by the party. It is therefore the decision against the title set up with reference to the treaty, and not the mere abstract construction of the treaty itself, upon which the statute intends to found the appellate jurisdiction. How indeed can it be possible to decide whether a title be within the protection of a treaty, until it is ascertained what that title is, and whether it have a legal validity? From the very necessity of the case, there must be a preliminary inquiry into the existence and structure of the title, before the Court can control the treaty in reference to that title. If the court below could decide that the title was bad, and therefore not protected by the treaty, must not this court have a power to decide the title to be good, and therefore protected by treaty? Is not the treaty in both instances equally construed, and the title of the party in reference to the treaty equally ascertained and decided? Nor does the clause relied on in the objection impugn this construction.
It requires that the error upon which the appellate court is to decide shall appear on the face of the record and immediately respect the questions before mentioned in the section. One of the questions is as to the construction of a treaty upon a title specially set up by a party; and every error that immediately respects that question, must of course be within the cognizance of the Court. The title set up in this case is apparent upon the face of the record, and immediately respects the decision of that question. Any error therefore in respect to that title must be re-examinable, or the case could never be presented to the Court.
*524 The restraining clause was manifestly intended for a very different purpose. It was foreseen that the parties might claim under various titles, and might assert various defences altogether independent of each other. The Court might admit or reject evidence applicable to one particular title and not to all. And in such cases, it was the intention of Congress to limit, what would otherwise have unquestionably attached to the Court the right of revising all the points involved in the cause. It therefore restrains the right to such errors as respect the question specified in the section. And in this view it has an appropriate sense, consistent with the preceding clauses. We are therefore satisfied, that upon principle, the case was rightfully before us;—and if the point were perfectly new we should not hesitate to assert the jurisdiction.
But the point has been already decided by this Court upon solemn argument. In Smith v. the State of Maryland, 6 Cranch 286, precisely the same objection was taken by counsel and overruled by the unanimous opinion of the Court. That case was in some respects stronger than the present, for the court below decided expressly that the party had no title, and therefore the treaty could not operate upon it. This Court entered into an examination of that question, and being of the same opinion, affirmed the judgment. There cannot then be an authority which could more completely govern the present question.
It has been asserted at the bar that in point of fact the Court of Appeals did not decide either upon the treaty or the title apparent upon the record; but upon a compromise made under an act of the Legislature of Virginia. If it be (as we are informed) that this was a private act to take effect only upon a certain condition, viz. the execution of a deed of release of certain lands, which was matter in pais, it is somewhat difficult to understand how the Court could take judicial cognizance of the act or of the performance *525 of the condition, unless spread upon the record. At all events, we are bound to consider that the Court did decide upon the facts actually before them. The treaty of peace was not necessary to have been stated, for it was the supreme law of the land, of which all courts must take notice. And at the time of decision in the Court of Appeals and in this Court, another treaty had intervened which attached itself to the title in controversy, and of course must have been the supreme law to govern the decision, if it should be found applicable to the case. It was in this view that this Court did not deem it necessary to rest its former decision upon the treaty of peace, believing that the title of the defendant was at all events perfect under the treaty of 1794.
The remaining questions respect more the practice than the principles of this Court. The forms of process and the modes of proceeding in the exercise of jurisdiction are, with few exceptions, left by the Legislature to be regulated and changed as this Court may in its discretion deem expedient. By a rule of this Court, the return of a copy of a record of the proper court under the seal of that court, annexed to the writ of error, is declared to be “a sufficient compliance with the mandate of the writ.” The record in this case is duly certified by the clerk of the Court of Appeals, and annexed to the writ of error. The objection, therefore, which has been urged to the sufficiency of the return, cannot prevail.
Another objection is, that it does not appear that the Judge who granted the writ of error did, upon issuing the citation, take the bond required by the 22d section of the judiciary act.
We consider that provision as merely directory to the Judge; and that an omission does not avoid the writ of error. If any party be prejudiced by the omission, this Court *526 can grant him summary relief, by imposing such terms on the other party as, under all the circumstances, may be legal and proper. But there is nothing in the record by which we can judicially know whether a bond has been taken or not. For the statute does not require the bond to be returned to this Court; and it might with equal propriety be lodged in the court below, who would ordinarily execute the judgment to be rendered on the writ. And the presumption of law is, until the contrary appears, that every Judge who signs a citation has obeyed the injunctions of the act.
We have this gone over all the principal questions in the cause, and we deliver our Judgment with entire confidence, that it is consistent with the Constitution and Laws of the land*.
It is the Opinion of the whole Court, that the Judgment of the Court of Appeals of Virginia, rendered on the Mandate in this Cause, be reversed, and the Judgment of the District Court held at Winchester be, and the same is hereby affirmed.
Johnson, J.
It will be observed in this case, that the Court disavows all intention to decide on the right to issue a mandamus to the State Courts; thus leaving us, in my opinion, where the Constitution places us,—supreme over persons and cases as far as our judicial powers extend, but not asserting any compulsory control over the state tribunals.
In this view, I acquiesce in their decision, but not altogether in the reasoning or opinion of my brother who deli *527 vered it. Few minds are accustomed to the same habit of thinking, and our conclusions are more satisfactory to ourselves when arrived at in our own way.
I have another reason for expressing my opinion on this occasion. I view this question as one of the most momentous importance; as one which may affect in its consequences the permanence of the American Union. It presents an instance of collision between the judicial powers of the Union and one of the greatest states of the union, on a print the most delicate and difficult to be adjusted. On the one hand, the general government must cease to exist whenever it loses the power of protecting itself in the exercise of its constitutional powers. Force, which acts upon the physical powers of man,—or the judicial process, which addresses itself to his moral principles or his fears, are the only means to which governments can resort in the exercise of their authority. The former is happily unknown to the genius of our Constitution, except as far as it shall be sanctioned by the latter; but let the latter be obstructed in its progress by an opposition which it cannot overcome or put by, and the resort must be to the former, or government is no more.
On the other hand, so firmly am I persuaded that the American people can no longer enjoy the blessings of a free government, whenever the state sovereignties shall be prostrated at the feet of the general government, nor the proud consciousness of equality and security, any longer than the independence of judicial power shall be maintained consecrated, and intangible, that I could borrow the language of a celebrated orator, and exclaim—“ I rejoice that Virginia has resisted."
Yet here I must claim the privilege of expressing my regret, that the opposition of the high and truly respected tribunal of that state, had not been marked with little more moderation. The only point necessary to be decided *528 in the case then before them, was “whether they were bound to obey the mandate emanating from this Court?” But in the judgment entered on their minutes, they have affirmed that the case was in this court coram non judice, or in other words, that this court had not jurisdiction over it.
This is assuming a truly alarming latitude of judicial power. Where is it to extend? It is an acknowledged principle of I believe in every court in the world, that not only the decisions, but every thing done under the judicial process of courts not having jurisdiction, are ipso facto, void. Are then, the judgments of this court to be reviewed in every court of the Union? and is every recovery of money, every change of property, that has taken place under our proceess to be considered null, void, and tortious?
We pretend not to more infallibility than other courts, composed of the same frail materials which compose this. It would be the height of affectation to close our minds upon the recollection that we have been extracted from the same seminaries in which originated the learned men who preside over the state tribunals. But, there is one claim which we can with due confidence assert in our own name upon those tribunals. The profound, uniform, and unaffected respect which this court has always exhibited for state decisions, give us strong pretensions to judicial comity. And another claim I may assert, in the name of the American people. In this court, every state in the Union is represented. We are constituted by the voice of the Union. And when decisions take place, which nothing but a spirit to give ground and harmonize can reconcile, ours is the superior claim upon the comity of state tribunals. It is the nature of the human mind to press a favorite hypothesis too far. But magnanimity will always be ready to sacrifice the pride of opinion to public welfare.
*529 In the case before us, the collision has been on our part wholly unsolicited. The exercise of this appellate jurisdiction over the state decisions has long been acquiesced in, and when the writ of error in this case was allowed by the President of the Court of Appeals of Virginia, we were sanctioned in supposing that we were to meet with the same acquiescence there. Had that court refused to grant the writ in the first instance, or had the question of jurisdiction or on the mode of exercising jurisdiction, been made there originally, we should have been put on our guard, and might have so modelled the process of this court as to strip it of the offensive form of a mandate. In this case it may have been brought over to what probably the 25th section of the jurisdiction act meant it should be to wit, an alternative judgment either that the State Court may finally proceed, at its option, to carry into effect the judgment of this court? or if it declined doing so, that then this court would proceed itself to execute it. The words “sense” and “operaration,” of the 25th section on this subject, merit particular attention. In the preceding section, which has relation to the causes brought up by writ of error from the circuit courts of the United States, this court is instructed not to issue the executions, but to send a special mandate to the Circuit Court to award the execution thereupon. In case of the Circuit Court’s refusal to obey such mandate, there could be no doubt, as to ulterior measures, compulsory measures might unquestionably be resorted to. Nor indeed was there any reason to suppose that they ever would refuse. And therefore there is no provision made for authorising this court to execute its own judgment in cases of that description. But not so in cases brought up from the state courts. The framers of that law plainly foresaw that the state courts may refuse; and not being willing to leave ground for the implication, that compulsory process must be resorted to, because no specific-provision was made, they have provided the means, by authorising this court, in case *530 of reversal of the state decision, to execute its own judgment. In case reversal only, was this necessary; for in case of affirmance, this collision could not arise. It is true, that the words of this section are, that this court may, in their discretion, proceed to execute its own judgment. But these words were very properly put in, that it might not be made imperative upon this court to proceed indiscriminately in this way, as it could only necessary in case of the refusal of the state courts. And this idea is fully confirmed by the words of the 13th section, which restrict this court in issuing the writ of mandamus, so as to confine it expressly to those courts which are constituted by the United States.
In this point of view the Legislature is completely vindicated from an intention to violate the independence of the state, judiciaries. Nor can this court, with any more correctness, have imputed to it similar intentions. The form of the mandate issued in this case is that known to appellate tribunals, and used in the ordinary cases of writs of error from the courts of the United States. It will perhaps not be too much in such cases, to expect of those who are conversant in the forms, fictions, and technicality of the law, not to give to the process of courts too literal a construction. They should he considered with a view to the ends they are intended to answer, and the law and practice in which they originate. In this view, the mandate was no more than a mode of submitting to that court the option which the 25th section holds out to them.
Had the decision of the Court of Virginia been confined to the point of their legal obligation to carry the judgment of this court into effect, I should have thought it unnecessary to make any further observations in this cause. But we are called upon to vindicate our general revising power, and its due, exercise in this particular case.
*531 Here, that I may not be charged with arguing upon a hypothetical case, it is necessary to ascertain what the real question is which this court is now called to decide.
In doing this, it is necessary to do what, although in the abstract is of questionable propriety appears to be generally acquiesced in, to wit, to review the case as it originally came up to this court on the former writ of error. The cause then came upon a case stated between the parties, and under the practice of that state, having the effect of a special verdict. The case stated, brings into view the treaty of peace with Great Britain, and then proceeds to present the various laws of Virginia and the facts upon which the parties found their respective titles. It then presents no particular question, but refers generally to the law arising out of the case. The original decision was obtainted prior to the treaty of 1791, but before the case was adjudicated in this court the treaty of 1794 had been concluded.
The objection arises under the construction of the 25th Section above mentioned; which, as far as it relates to this case, is in these words—“a final judgment or decree in any suit, in the highest court of law or equity of a state, in which a decision in the suit could be had,” “where is drawn in question the construction of any clause of the Constitution or of a treaty,” and the decision is against the title set up or claimed by either party under such clause, may be re-examined and reversed, and affirmed,” &c.
“But no other error shall be assigned or regarded as a ground of reversal in such case as aforesaid, than such as appears on the face of the record, and immediately respects the before mentioned questions of validity or construction of the said treaties,” &c.
The first point to be decided under this state of the case was, that the judgment being a part of the record, if that judgment was not such, as upon that case it ought to hav *532 e been, it was an error apparent on the face of the record. But it was contended, that the case there stated, presented a number of points upon which the decision below may have been founded, and that it did not therefore necessarily appear to have been an error immediately respecting a question on the construction of a treaty. But the Court held, that as the reference was general to the law. arising out of the case, if one question arose which called for the construction of a treaty, and. the decision; negatived the right set up under it, this court will reverse that decision and that it is the duty of the party who would avoid the inconvenience of this principle, so to mould the case as to obviate the ambiguity. And under this point arises the question, whether this court can enquire, into the title of the party, or whether they are so restricted in their judicial powers as to be confined to decide on, the operation of a treaty Upon a title previously ascertained to exist.
If there is any one point in the case, on which an opinion may be given with confidence, it is this. Whether we consider the letter of the statute, or the spirit, intent, or meaning of the Constitution and of the Legislature, as expressed in the 25th section, it is equally clear that the title is the primary object to which the attention of the Court is called in every such case. The words are—“ and the decision be against the title” so set up, not against the construction of the treaty contended for by the party setting up the title. And how could it be otherwise? The title may exist notwithstanding the decision of the state courts to the contrary: and in that case, the party is entitled to the benefits intended to be secured to him by the treaty. The decision to his prejudice, may have been the result of those very errors, partialities, or defects in state jurisprudence, against which the Constitution intended to protect the individual. And if the contrary doctrine be assumed, what is the consequence? This court may then be called upon to decide on *533 a mere hypothetical case,—to give a construction to a treaty, without first deciding whether there was any interest on which that treaty, whatever be its proper construction, would operate. This difficulty was felt, and weighed, in the case of Smith and the State of Maryland, and the decision was founded upon the idea that this Court was not thus restricted.
But another difficulty presented itself. The treaty of 1794 had become the supreme law of the land, since the judgment rendered in the court below. The defendant, who was at that time an alien, had now become confirmed in his rights, under that treaty. This would have been no objection to the original judgment. Were we then at liberty to notice that treaty in rendering the judgment of this court? Having dissented from the opinion of the court below, on the question of title, this difficulty did not present itself in any way, in the view I then took of the case. But the majority of the Court determined that, as a public law, the treaty was a part of the law of every case depending in this court. That as such, it was not necessary that it should be spread upon the record; and that, it was obligatory upon this court, in rendering judgment upon this writ of error, notwithstanding the original judgment may have been otherwise, unimpeachable. And to this opinion I yielded my hearty assent. For it cannot be maintained that this court is bound to give a judgment unlawful at the time of entering it, in consideration that the same judgment would have been lawful at any prior time. What judgment can now be lawfully rendered between the parties? is he question to which the attention of the Court is called. And if the law which sanctioned the original judgment expire, pending an appeal, this court has repeatedly reversed the judgment below, although rendered whilst the law existed. So too, if plaintiff in error die, pending suit, and his land descend on an alien, it cannot be contended that this court *534 will maintain the suit in right of the judgment, in favour of his ancestor notwithstanding his present disability,
It must here be recollected, that this is an action of ejectment. If the term formerly declared upon expires, pending the action, the Court will permit the plaintiff to amend, by extending the term. Why? Because although the right may have been in him at the commencement of the suit, it has ceased before judgment, and without this amendment he would not have judgment. But suppose the suit were really instituted to obtain possession of a leasehold, and the lease expire before judgment, would the Court permit the party to amend, in opposition to the right of the case? On the contrary, if the term formally declared on, were more extensive than the lease in which the legal title was founded, could they give judgment for more than facts? It must be recollected, that under this judgment a writ of restitution is the fruit of the law. This, in its very nature, has relation to, and must be founded upon a present existing right at the time of judgment. And whatever, be the cause which takes this right away, the remedy must, in the reason and nature of things, fall with it.
When all these incidental points are disposed of, we find the question finally reduced to this—Does the judicial power of the United States extend to the revision of decisions of state courts, in cases arising under treaties? But, in order to generalize the question, and present it in the true form in which it shows itself in this case, we will enquire whether the Constitution sanctions the exercise of a revising power over the decisions of state tribunals, in those cases to which the judicial power of the United States extends?
And here, it appears to me, that the great difficulty is on the other side. The real doubt, whether the state tribunals can constitutionally exercise jurisdiction in any of the cases to which the judicial power of the United States extends.
*535 Some cession of judicial power is contemplated by the 3d article of the Constitution. That which is ceded can no longer to be retained. In one of the circuit courts of the United States, it has been decided (with what correctness I will not say) that the cession of a power to pass a uniform act of bankruptcy, although not acted on by the United States, deprives the States of the power of passing laws to that effect. With regard to the admiralty and maritime jurisdiction, it would be difficult to prove that the States could resume it if the United States should abolish the courts vested with that jurisdiction. Yet, it is blended with the other cases of the jurisdiction, in the 2d section of the 3d article, and ceded in the same words.
But it is contended, that the 2d section of the 3d article contains no expression of cession of jurisdiction. That it only vests a power in Congress to assume jurisdiction to the extent therein expressed. And under this head arose the discussion on the construction proper to be given to that article. On this part of the case I shall not pause long. The rules of construction, where the nature of the instrument is as certain, are familiar to every one. To me the Constitution appears, in every light of it, to be a contract which, in legal language, may be denominated tripartite. The parties are the People, the States, and the United States. It is returning in a circle to contend, that it professes to be the exclusive act of the people; for what have the people done but to form this compact? That the States are recognised as parties to it, is evident from various passages, and particularly that in which the United States guarantee to each state a republican form of government. The security and happiness of the whole was the object; and to prevent dissention and collision, each surrendered those powers which might make them dangerous to each other. Well aware of the sensitive irritability of sovereign states, where their wills or interests clash, they placed themselvees, with *536 regard to each other, on the footing of sovereigns upon the ocean; where power is mutually conceded to act upon the individual, but the national vessel must remain unviolated. But to remove all ground for jealousy and complaint, they relinquish the privilege of being any longer the exclusive arbiters of their own justice, where the rights of others come in question, or the great interests of the whole may be affected by those feelings, partialities, or prejudices which they meant to put down forever.
Nor shall I enter into a minute discussion of the meaning of the language of this section. I have seldom found much good result from hypercritical severity in examining the distinct force of words. Language is essentially defective in precision. More so than those are aware of, who are not in the habit of subjecting it to philological analysis. In the case before us, for instance, a rigid construction might be made, which would annihilate the powers intended to be ceded. The words are—"shall extend to.” But that which extends to, does not necessarily include in. So that the circle may enlarge until it reaches the objects that limit it, and yet not take them in. But the plain and obvious sense and meaning of the word shall in this sentence, is the future sense, and has nothing imperative in it. The language of the framers of the Constitution is—“ we are about forming a general government. When that government is formed, its powers shall extend,” &c. I therefore, see nothing imperative in this clause; and it certainly would have been very unnecessary to use the word in that sense. For as there was no controlling power constituted, it would only, if used in an imperative sense, have imposed a moral obligation to act. But the same result arises from using it in a future sense; and the Constitution everywhere assumes, as a postulate, that wherever power is given, it will be used, or, at least, used as far as the interest of the American people require it, if not from the natural proneness of *537 man to the exercise of power, at least from a sense of duty, and the obligation of an oath. Nor can I see any difference in the effect of the words used in this section, as to the scope of the jurisdiction of the United States’ courts over the cases of the first and second description, comprised in that section. “ Shall extend to controversies” appears to me as comprehensive in effect, as shall extend to all cases.” For if the judicial powers extend “ to controversies between citizen and alien,” &c. to what controversies of that description does it not extend? If no case can be pointed out which is excepted, it then extends to all controversies.
But I, will assume the construction as a sound one, that the cession of power to the general government, means no more than that they may assume the exercise of it whenever they think it advisable. It is clear that Congress have hitherto acted under that impression, and my own opinion is in favour of its correctness. But does it not then follow that the jurisdiction of the State Court, within the range ceded to the general government, is permitted and may be withdrawn whenever Congress think proper to do so? As it is a principle that every one may renounce a right introduced for his benefit, we will admit that they may constitutionally exercise jurisdiction in such cases. Yet surely the general power to withdraw the exercise of it, includes in it the right to molify, limit, and restrain that exercise. “ This is my domain. Put not your foot upon it. If you do, you are subject to my laws. I have a right to exclude you altogether. I have then a right to prescribe the terms of your admission to a participation. As long as you conform to my laws, participate in peace. But I reserve to myself the right of judging how far your acts are conformable to my laws.” Analogy, then, to the ordinary exercise of sovereign authority would sustain, the exercise of this controling or revising power.
*538 But it is argued that a power to assume jurisdiction to the constitutional extent does not necessarily carry with it a right to exercise appellate power over the state tribunals.
This is a momentous question, and one on which I shall reserve myself uncommitted for each particular case as it shall occur. It is enough at present to have shown that Congress has not asserted and this court has not attempted to exercise that kind of authority in personam over the state courts which would place then in the relation of an inferior responsible body independent of their own acquiescence. And I have too much confidence in the state tribunals to believe, that a case ever will occur in which it will be necessary for the general government to assume a controlling power over those tribunals. But is it difficult to suppose a case which will call loudly for some remedy or restraint? Suppose a foreign minister or an officer acting regularly under authority from the United States, seized to-day, tried to-morrow, and hurried the next day to execution. Such cases may occur, and have occurred in other countries. The angry vindictive passions of men have too often made their way into judicial tribunals, and we cannot hope for ever to escape their baneful influence. In the case supposed, there ought to be a power somewhere to restrain or punish, or the union must be dissolved. At present the uncontrollable exercise of criminal jurisdiction is most securely confided to the state tribunals. The counts of the United States are vested with no power to scrutinize into the proceedings of the state courts in criminal cases. On the contrary, the general government has in more than one instance exhibited their confidence by a wish to vest them with the execution of their own penal laws. And extreme, indeed, I flatter myself, must be the case in which the general government could ever be induced to assert this right. If ever such a case should occur, it will be time enough to decide upon their right to do so.
*539 But we know that by the 3d article of the Constitution judicial power to a certain extent, is vested in the general government; and that by the same instrument power is given to pass all laws necessary to carry into effect the provisions of the Constitution. At present it is only necessary to vindicate the laws which they have passed affecting civil cases pending in state tribunals.
In legislating on this subject, Congress in the true spirit of the Constitution, have proposed to secure to every one the full benefit of the Constitution without forcing any one necessarily into the Courts of the United States. With this view, in one class of cases, they have not taken away absolutely from the state courts all the cases to which their judicial power extends, but left it to the plaintiff to bring his action there originally if he chose, or to the defendant to force the plaintiff into the courts of the United States, where they have jurisdiction, and the former has instituted his suit in the state courts. In this case they have not made it legal for the defendant to plead to the jurisdiction, the effect of which would be to put an end to the plaintiff’s suit and oblige him, probably at great risk or expense, to institute new action; but the act has given him a right to obtain an order for a removal on a petition to the state court, upon which the cause with all its existing advantages is transferred to the circuit court of the United States. This, I presume, can be subject to no objection. As the legislature has an unquestionable right to make the ground of removal a ground of plea to a jurisdiction, and the court must then do no more than it is now called upon to do, to wit, give an order or a judgment, or call it what we will, in favour of the defendant. And so far from asserting the inferiority of the state tribunal, this act is rather that of a superior, inasmuch as the circuit court of the United States becomes bound by that order to take jurisdiction of the case. This method, so much more unlikely to affect official delicacy, than that *540 which is resorted to in the other class of cases, might perhaps have been more happily applied to all the cases which the legislature thought it advisable to remove from the state courts. But the other class of cases, in which the present is included, was proposed to be provided for in a different manner. And here again, the Legislature of the Union evince their confidence in the state tribunals, for they do not attempt to give original cognizance to their own circuit courts of such cases, or to remove them by petition and order, but still believing that their decisions will be generally satisfactory, a writ of error is not given immediately, as a question within the United States shall occur, but only in case the decision shall finally in the court of the last resort be against the title set up under the constitution, treaty, &c.
In this act, I can see nothing which amounts to an assertion of the inferiority or dependance of the state tribunals. The presiding judge of the state Court is himself authorised to issue the writ of error, if he will, and thus give jurisdiction to the Supreme Court; and if he think proper to decline it, no compulsory processes provided by law to oblige him. The party who imagines himself aggrieved is then at liberty to apply to a judge of the United States, who issues the writ of error, which (whatever the form) is in substance no more than a mode of compelling the opposite party to appear before this court and maintain the legality of his judgment obtained before. An exemplification of the record is the common property of every one who chuses to apply and pay for it, and thus the case and the parties are brought before us. And so far is the court itself from being brought under the revising power of this court, that nothing but the case as presented by the record and pleadings of the parties is considered, and the opinions of the court are never resorted to unless for the purpose of assisting this court in forming their own opinion.
*541 The absolute necessity that there was for Congress to exercise something of a revising power over the cases and parties in the state courts, will appear from this consideration.
Suppose the whole extent of the judicial power of the United States vested in their own courts, yet such a provision would not answer all the ends of the Constitution, for two reasons.
1st. Although the plaintiff may in such case have the full benefit of the Constitution extended to him, yet the defendant would not: as the plaintiff might force him into the court of the state at his election.
2dly. Supposing it possible so to legislate as to give the courts of the United States original jurisdiction in all cases arising under the Constitution, laws, &c. in the words of the 2d section of 3d article, (a point on which I have some doubt and which in time, might perhaps render the quo minus fiction of Great Britain necessary,) yet a very large class of cases would remain unprovided for. Incidental questions would often arise, and as a court of competent jurisdiction in the principal case, must decide all such questions, whatever laws they arise under, endless might be the diversity of decisions throughout the Union upon the Constitution, treaties and laws of the United States; a subject on which the tranquility of the Union internally and externally may materially depend.
I should feel the more hesitation in adopting the opinions which I express in this case, were I not firmly convinced that they are practical and may be acted upon without compromiting the harmony of the Union, or bringing humility upon the state tribunals. God forbid that the judicial power in these states should ever, for a moment, even in its humblest departments, feel a doubt of its own independence.— *542 Whilst adjudicating on a subject which the laws of the country assign finally to the revising power of another tribunal, it can feel no such doubt. An anxiety to do justice is ever relieved by the knowledge that what we do is not final between the parties. And no sense of dependance can be felt from the knowledge that the parties, not the court, may be summoned before another tribunal. With this view, by means of laws avoiding judgments obtained in the state courts, in cases over which Congress has constitutionally assumed jurisdiction, and inflicting penalties on parties who shall contumaciously persist in infringing the constitutional rights of others. Under a liberal extension of the writ of injunction, and the habeas corpus ad subjiciendum, I flatter myself that the full extent of the constitutional revising power may be secured to the United States, and the benefits of it to the individual, without ever resorting to compulsory or restrictive process upon the same tribunals. A right which I repeat again, Congress has not asserted, nor has this Court asserted, nor does there appear any necessity for asserting.
The remaining points in the case being mere questions of practice, I shall make no remarks upon them.

 The same expression, “ shall be vested,” occurs in some other parts of the Constitution in defining the powers of other co-ordinate branches of the government. The first article declares “that all legislative powers herein granted shall be vested in a Congress of the United States.” Will it be contended that the legislative power is not absolutely vested? The 2d article declares that “ the executive power shall be vested in a President of the United States of America.” Could Congress vest it in any other person, or is it to await their good pleasure whether if is to vest at all? It is apparent that such is construction in either case is inadmissible. Why then is it entitled to a better support in reference to the judicial department?

 But even admitting that the language of the Constitution is not mandatory, and that Congress may constitutionally omit to vest the judicial power in courts of the United States, it cannot be denied that when it is vested it may be exercised to the utmost constitutional extent.

 The remedy too of removal of suits would be utterly inadequate to the purposes of the Constitution, if it could act only on the parties, and not upon the state courts. In respect to criminal prosecutions, the difficulty seems admitted to be insurmountable; and in respect to civil suits, there would in many cases be rights without corresponding remedies. If state courts should deny the constitutionality of the authority to remove suits from their cognizance, in what manner could they be compelled to relinquish the jurisdiction? In respect to criminal cases, there would at once be an end of all control, and the state decisions would be paramount to the Constitution. And though in civil suits the courts of the United States might act upon the parties; yet the state courts might act in the same way. And this conflict of jurisdiction would not only jeopardize private rights, but bring into imminent peril the public interests.

 We have not thought it incumbent on us to give any opinion upon the question whether this, Court have authority to issue a writ of mandamus to the Court of Appeals, to enforce the former Judgments, as we do not think it necessarily involved in the decision of the cause.